# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

DEBRA FRIZIELLIE,           )
                                   )
     Plaintiff,         )
                                   )
   vs.                 )        Case No. 4:11CV1782 LMB
                                   )
MICHAEL J. ASTRUE,         )
Commissioner of Social Security,     )
                                   )
     Defendant.       )

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Debra Friziellie for Disability Insurance Benefits under Title II of the Social Security Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. (Doc. No. 16). Defendant filed a Brief in Support of the Answer. (Doc. No. 20).

## Procedural History

On December 8, 2009, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on November 15, 2009. (Tr. 130-36). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated March 25, 2011. (Tr. 78-82, 8-23). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on September 12, 2011. (Tr. 4-7, 1-3).

Thus, the decision of the ALJ stands as the final decision of the Commissioner.  <u>See</u> 20 C.F.R. §§ 404.981, 416.1481.

## **Evidence Before the ALJ**

**A.     ALJ Hearing**

Plaintiff's administrative hearing was held on January 6, 2011.  (Tr. 26).  Plaintiff was present and was represented by counsel.  (<u>Id.</u>).

Plaintiff's attorney noted that plaintiff had recently undergone foot surgery, and requested additional time to obtain and submit these records.  (Tr. 28).  The ALJ indicated that he would hold the record open for thirty days.  (<u>Id.</u>).

The ALJ examined plaintiff, who testified that she was married and had two adult biological children and three adult step-children.  (Tr. 30).  Plaintiff testified that she had a twelfth grade education.  (<u>Id.</u>).  Plaintiff stated that she had not taken any college classes, but she had received training through her hospital work.  (<u>Id.</u>).  Plaintiff testified that she was five-feet, one-inch tall, and weighed 180 pounds.  (<u>Id.</u>).  Plaintiff stated that she was able to read and perform simple mathematics.  (Tr. 31).

Plaintiff testified that she had a computer at home with Internet access.  (<u>Id.</u>).  Plaintiff stated that she had a Facebook account.  (<u>Id.</u>).

Plaintiff testified that she filed workers' compensation claims in approximately 1995 and 1999 due to a right shoulder injury and neck injury.  (Tr. 32).  Plaintiff stated that these claims settled.  (<u>Id.</u>).

Plaintiff testified that she last worked in November of 2009.  (<u>Id.</u>).  Plaintiff stated that she worked at St. Anthony's Medical Center watching heart monitors.  (Tr. 33).  Plaintiff testified

that she sat in a room watching heart monitors for the whole hospital, printed strips, and read the information at this position. (Tr. 34). Plaintiff stated that she started working at St. Anthony's in 1991. (Id.). Plaintiff testified that she previously worked as a nurse assistant at St. Anthony's. (Id.). Plaintiff stated that, as a nurse assistant, she checked vital signs, bathed patients, and assisted with any dressing changes. (Tr. 35).

Plaintiff testified that she had also worked part-time as a CNA. (Id.). Plaintiff stated that she only took care of one person at this position. (Id.). Plaintiff testified that she performed this work for three to four years. (Tr. 36).

Plaintiff testified that she had undergone a neck fusion surgery in November of 2009. (Id.). Plaintiff stated that she underwent physical therapy following surgery. (Tr. 37). Plaintiff testified that she still experienced neck pain following surgery. (Id.). Plaintiff stated that she was taking pain medication for her neck pain. (Id.).

Plaintiff stated that she has two ruptured discs in the thoracic area of her back. (Tr. 38). Plaintiff testified that she does not want to undergo surgery, and that she just takes pain medication for this impairment. (Id.).

Plaintiff stated that she also has fibromyalgia. (Tr. 39). Plaintiff testified that her primary doctor, Dr. Bryan Burns, diagnosed her with fibromyalgia. (Id.).

Plaintiff stated that she has irritable bowel syndrome. (Id.). Plaintiff testified that she had had this condition for years, and was able to work with it, but it has worsened. (Tr. 40). Plaintiff stated that she has been really depressed. (Id.). Plaintiff testified that she sees a psychiatrist, Dr. Srinivas Chilakamarri. (Id.). Plaintiff stated that she has been seeing Dr. Chilakamarri for approximately a year-and-a-half, and that he prescribes medication, including

Xanax, Wellbutrin, and Cymbalta.  (Id.).

Plaintiff testified that she has plantar fasciitis and fibromas on the bottoms of her feet.  (Tr. 41).  Plaintiff stated that she underwent surgery on her left foot to remove the fibromas.  (Id.).  Plaintiff testified that she has had this condition for about ten years.  (Id.).

Plaintiff stated that she has clogged arteries in her heart, and that a stent was placed in 2007.  (Id.).  Plaintiff testified that she had recently undergone stress tests.  (Id.).

Plaintiff stated that she had sleep apnea, and that she uses a CPAP machine.  (Tr. 43).

Plaintiff testified that she takes many medications, and that her primary care doctor monitors all of her medications.  (Tr. 44).  Plaintiff stated that she experiences fatigue due to her medications.  (Id.).  Plaintiff testified that her medications help her conditions somewhat.  (Id.).

Plaintiff stated that she smokes, and that her doctor has advised her to quit smoking due to her back injuries.  (Tr. 45).

Plaintiff testified that she has a driver's license and that she was still driving at the time of the hearing.  (Id.).  Plaintiff stated that she cooks fast meals.  (Id.).  Plaintiff testified that she has been unable to stand longer than five minutes since undergoing foot surgery.  (Tr. 46).  Plaintiff stated that she washes dishes occasionally.  (Id.).  Plaintiff testified that she does not usually do laundry.  (Id.).  Plaintiff stated that she does not vacuum or do yard work.  (Tr. 47).  Plaintiff testified that she occasionally shops for groceries.  (Id.).

Plaintiff stated that her husband is disabled and does not work.  (Id.).  Plaintiff testified that her husband occasionally does the laundry but otherwise does not help with household chores.  (Tr. 48).  Plaintiff stated that her daughter helps with household chores.  (Id.).

Plaintiff testified that she lives in a split foyer home with a basement.  (Id.).  Plaintiff stated

that the washer and dryer are in her basement.  (Id.).

Plaintiff testified that she has two biological grandchildren and twelve step-grandchildren, who range in age from one to eighteen.  (Tr. 49).

Plaintiff stated that she has one dog.  (Id.).  Plaintiff testified that she performed light household cleaning, such as dusting, wiping off counters, and folding laundry, prior to her foot surgery.  (Id.).

Plaintiff stated that she told Dr. Peter Mirkin, her neck surgeon, that she had no plans on returning to work because she did not feel she was able to work.  (Tr. 50).

Plaintiff testified that, prior to undergoing foot surgery, she was able to stand for ten to fifteen minutes, walk for five to ten minutes, sit for an hour, and lift approximately ten pounds.  (Tr. 51).

Plaintiff's attorney examined plaintiff, who testified that she experiences chest pain approximately once a week.  (Tr. 52).  Plaintiff stated that, when she experiences chest pain, she is unable to continue her activity.  (Id.).

Plaintiff testified that she experiences headaches almost daily.  (Id.).  Plaintiff stated that she has to lie down in a dark room for about one hour two to three times a week due to headaches.  (Id.).

Plaintiff testified that she has a rotator cuff tear in her right shoulder, which causes pain when she lifts anything with her right arm.  (Tr. 53).  Plaintiff stated that she experiences pain when she holds her right arm above her head.  (Id.).  Plaintiff testified that she also experiences pain when she reaches forward.  (Id.).

Plaintiff stated that she rarely visits her grandchildren because she hardly leaves her home

due to pain and her mental impairments.  (Id.).

Plaintiff testified that she experiences crying spells a couple of times a week, which last between a few hours and all day.  (Tr. 54).  Plaintiff stated that she bathes and changes clothes daily.  (Id.).

Plaintiff testified that she does not sleep well due to pain and sleep apnea.  (Id.).

Plaintiff stated that she spends most of her day in bed.  (Tr. 55).  Plaintiff testified that she only gets out of bed a total of approximately four to five hours during the day.  (Id.).

The ALJ re-examined plaintiff, who testified that Dr. Gibson was her cardiologist.  (Id.). Plaintiff stated that she disagreed with Dr. Gibson's opinion regarding her limitations.  (Id.). Plaintiff testified that Dr. Gibson probably was not aware of all of her impairments, such as her fibromyalgia.  (Tr. 56).  Plaintiff stated that Dr. Gibson placed a stent in her heart.  (Tr. 57).

The ALJ next examined vocational expert Robin Cook.  (Id.).  Dr. Cook described plaintiff's past work as cardiovascular technician, which was skilled and light as defined by the DOT, and sedentary as performed by plaintiff.  (Tr. 59).  Dr. Cook testified that plaintiff also worked as a home attendant (semi-skilled, medium); order clerk (semi-skilled, sedentary); and nurse aide (semi-skilled, medium).  (Tr. 60-62).

The ALJ asked Dr. Cook to assume a hypothetical claimant with plaintiff's background, who could perform light work with the following limitations: climb stairs and ramps occasionally; never climb ropes, ladders or scaffolds; and stoop, kneel, crouch, and crawl occasionally.  (Tr. 62).  Dr. Cook testified that such an individual could perform plaintiff's past work as a cardiovascular tech and order clerk.  (Id.).

The ALJ next asked Dr. Cook to assume the same limitations as the first hypothetical,

with the additional restriction of a sit/stand option with the ability to change positions frequently. (Id.). Dr. Cook testified that the individual would be able to perform plaintiff's past work as the cardiovascular tech. (Tr. 63). Dr. Cook stated that the individual would probably not be able to perform the order clerk position as defined in the DOT, although she could probably perform it as plaintiff performed the position. (Id.). Dr. Cook testified that the individual could perform other jobs, such as office helper (1,440 in Missouri, 96,110 nationally). (Id.).

The ALJ asked Dr. Cook to assume the same limitations as the second hypothetical, with the additional restriction of only frequent reaching in all directions. (Id.). Dr. Cook testified that this would not affect the individual's ability to perform the positions she previously described. (Tr. 64).

Finally, the ALJ asked Dr. Cook to assume the same limitations as the third hypothetical, with the additional restriction of a need for two additional breaks beyond the normal two breaks and a lunch break during the normal duty day. (Id.). Dr. Cook testified that there would be no jobs that such an individual could perform. (Id.).

Plaintiff's attorney then examined Dr. Cook, who testified that employers probably would not tolerate at least one absence a month on a sustained basis. (Tr. 65).

Plaintiff's attorney next asked Dr. Cook to assume the limitations found by Dr. Brian Burns. (Id.). Dr. Cook testified that the individual would not be able to perform plaintiff's past work or any other work with these limitations. (Tr. 67).

## B.    Relevant Medical Records

Defendant states that he adopts the statement of facts contained in plaintiff's brief. The following summary of the relevant medical records is taken from plaintiff's brief:

1.  Plaintiff underwent a cardiac catheterization May 24, 2007 by Dr. Paul Gibson M.D.  (Tr. 308).  It was noted plaintiff had been complaining of worsening symptoms of chest pain. (Id.).  The final diagnosis was left normal left ventricular function with an estimated ejection fraction at 50%, mild single vessel coronary artery disease, internal mammary artery angiography, and abdominal aortography with a 30% irregularity in the distal part. (Tr. 309).

2.  Plaintiff had a cardiac stress test on June 7, 2007 performed by Dr. A. Rasid Qureshi.  (Tr. 312).  The impression was negative stress test for EKG changes of ischemia, with ST changes as described, without angina pectoris.  (Id.).  The thallium scan report showed equivocal lateral reversible defect and normal left ventricular wall motion, size, and ejection fraction of 0.54.  (Tr. 313).

3.  A transthoracic echocardiogram dated September 19, 2008 noted plaintiff had presented with a murmur and had a stent. (Tr. 302).  It was noted overall left ventricular systolic function was normal, and left ventricular ejection fraction was estimated in the range of 55-65%, and there were no left ventricle regional wall motion abnormalities.  (Id.).

4.  Records from Dr. Gibson dated September 19, 2008 noted plaintiff had last been seen with a stent secondary to coronary artery disease, but was still smoking.  (Tr. 294).  The impression from this visit was chest pain and coronary artery disease.  (Id.).

5. A cardiac catheterization was performed September 25, 2008 by Dr. Paul Gibson M.D. (Tr. 297-298).  The clinical summary in this report noted plaintiff had a known history of coronary artery disease and in July 2007 underwent angioplasty and stenting (utilizing a drug eluting stent) of the left anterior descending coronary artery.  (Tr. 297).  Recently,

plaintiff had a positive stress test and worsening symptoms of chest pain. (Id.).

Plaintiff also notably had a known past history of chest pain, hypertension, and hypocholesteremia. (Id.). The final diagnosis from this testing was normal left ventricular function with an estimated ejection fraction of 50%, mild two vessel coronary artery disease, and abnormal aortography. (Tr. 298). It was noted the left coronary artery was free of significant disease, but the proximal portion of the anterior descending had a 40% narrowing in the distal part, the mid portion of the anterior descending had a 40% narrowing at the origin, and a 40% narrowing in the mid-part. (Id.). The distal portion of the anterior descending had a 40% narrowing in the proximal part, and the proximal part of the first diagonal branch of the anterior descending had been stented, with a 30% irregularity in the proximal part of this stent. (Id.). This was also in the distal part of the same segment. (Id.). The proximal portion of the circumflex artery was free of significant disease, and there was a 50% stenosis in the mid-part. (Id.). The first obtuse marginal artery had a 40% narrowing, and the second obtuse marginal artery was large and there was a 40% narrowing at the origin. (Id.). The right coronary artery was the dominant vessel, and it had a 50% stenosis in the mid-part and a 40% narrowing in the distal part, with the posterior descending artery and posteriolateral vessels free of significant disease. (Id.). The abdominal aorta graphic demonstrated an abdominal aorta that had a 30% irregularity in the distal part. (Id.).

6. Plaintiff was seen by Dr. Bryan Burns on January 21, 2009 to establish care. (Tr. 337). Plaintiff had a history of hypertension and a history of coronary artery disease and was status post stenting with recent stress test and cath in August, and her complaint was

diffuse muscle soreness which had been present for several years and was worsening, most prevalent in the shoulders, thighs, and hands. (Id.). The assessment at that time was hypertension, hyperlipidemia, and myalgia. (Id.). Dr. Burns indicated the myalgia could be secondary to fibromyalgia, and he reported all labs were normal. (Tr. 338).

7. Records dated March 2, 2009 from Dr. Steven Granberg, a pain management doctor, noted plaintiff's current medications included Lorcet, Naprosyn, and Valium. (Tr. 245). The assessment at that time was cervical degenerative disc disease, cervical radicular pain, history of left knee meniscal tear with surgical repair, and right knee pain. (Tr. 246). Plaintiff reported she continued to have her usual numbness of the right 4th and 5th fingers, and over the past month she was having numbness in the left hand. (Tr. 245).

8. Plaintiff was seen in a follow-up by Dr. Bryan Burns on March 4, 2009. (Tr. 340). The assessment at that time was hypertension, myalgia, impaired fasting glucose, and abnormal liver function testing. (Tr. 340-341). Plaintiff was to start Cymbalta delayed release tablet relative to the myalgia, and Dr. Burns thought it was likely due to fibromyalgia. (Tr. 341).

9. Plaintiff was seen by Dr. Burns on April 15, 2009 and assessed as having hypertension, impaired fasting glucose, and myalgia. (Tr. 342). Dr. Burns believed the component was likely fibromyalgia and depression. (Tr. 343).

10. Plaintiff was seen May 21, 2009 at Millennium Pain Management. (Tr. 247). Plaintiff completed a pain questionnaire and her chief complaint on that visit was pain in the neck and shoulders, described as aching, agonizing pain which was constant. (Id.). The

assessment at that time was cervical degenerative disc disease, cervical radicular pain, history of left knee meniscal tear with surgical repair, and right knee pain. (Tr. 248). Plaintiff was to continue on Lorcet for pain, with a maximum of 6 tablets per day, and Naproxen. (Id.). Plaintiff continued to have left pain and numbness for the past month, and was unable to do an MRI secondary to claustrophobia. (Id.). Based upon lab studies, plaintiff was also noted to be positive for taking Hydrocodone and Hydromorphone. (Tr. 251).

11. Plaintiff was seen by psychiatrist Dr. Srinivas Chilakamarri on June 2, 2009. (Tr. 243). Plaintiff at that time had pain medications including Lorcet and Percocet. (Id.).

12. An MRI of the cervical spine dated July 14, 2009 demonstrated at C5-6 a diffuse disc bulge lateralizing to the right, measuring 2 mm, anteriorly contacting the cervical spine cord. (Tr. 253). At T2-T3, there was a focal 3 mm left paracentral disc protrusion impinging upon the anterior margin of the spinal cord. (Id.). There was also a 2 mm central disc protrusion at C4-5. (Tr. 254).

13. Plaintiff was seen at Millennium Pain Management on August 12, 2009, and at that time was taking Lorcet, Naproxen, and Valium. (Tr. 255). Plaintiff complained of pain in the neck and right shoulder. (Id.). Plaintiff also wanted to have a right shoulder MRI to rule out rotator cuff tear. (Id.). When plaintiff returned for a follow-up, it was noted she had reviewed her MRI results of the cervical and thoracic spine with Dr. Mirkin, who indicated she had 2 cervical herniated discs, as well as a thoracic degenerated disc, and Dr. Mirkin had advised he would repair the cervical discs, but he would stay away from the thoracic area. (Id.). The assessment from this visit was cervical herniated

intervertebral disc, cervical radicular pain, right shoulder joint pain, thoracic spine pain, myofacial pain, and bilateral knee degenerative joint disease. (Tr. 256).

14. Plaintiff was seen by Dr. Burns August 12, 2009 in a follow-up and she complained of peripheral edema which was worse at night and after sitting at her computer workstation all day. (Tr. 344). Plaintiff noted the swelling was bilateral and had been ongoing for many months and was not progressive. (Id.). The assessment on this visit was hypertension, myalgia, edema, and dyspnea. (Tr. 345). Plaintiff was to use support stockings and elevate her legs when sitting. (Id.).

15. An MRI of the right shoulder dated August 19, 2009 demonstrated a small partial tear on the intra-articular surface of the supraspinatus and mild bursitis. (Tr. 286).

16. Plaintiff was seen by Dr. Mirkin on August 26, 2009 and it was noted he had reviewed the MRI and plaintiff did indeed have a partial rotator cuff tear and some impingement, and continued to have a positive impingement sign and difficulty in abduction. (Tr. 362). Dr. Mirkin tried an injection on that date into the subacromial bursa. (Id.).

17. Plaintiff was seen by Dr. Bryan Burns on September 16, 2009. (Tr. 347). The edema had improved. (Id.). Plaintiff however continued to have complaints in her upper back, neck, shoulders, and hips. (Id.). There had been minimal improvement with Cymbalta. (Id.). Plaintiff indicated she was followed by an orthopedic surgeon and recently had an injection into her shoulders, and they were considering neck surgery. (Id.). Dr. Burns diagnosed hypertension and back pain. (Id.).

18. Plaintiff was seen on September 28, 2009 by Dr. Chilakamarri, a psychiatrist. (Tr. 242). Medication at that point included Cymbalta and Neurontin. (Id.). Plaintiff was also

taking Xanax for panic.  (Id.).

19.  Plaintiff was seen by Dr. Bryan Burns on October 28, 2009 in a follow-up.  (Tr. 349).
Plaintiff was assessed as having hypertension and myalgia.  (Id.).  Dr. Burns also
questioned whether her ankle discomfort might be due to fibromyalgia.  (Tr. 350).  Plaintiff
was to continue on Neurontin.  (Id.).

20.  Plaintiff was seen by Dr. Mirkin November 4, 2009 who noted plaintiff stated the shot
into her shoulder had helped for a couple of weeks and then the pain had returned.   (Tr.
361).  She complained of pain in her neck radiating down the right arm.  (Id.).  Plaintiff
had limited range of motion of her neck, a positive Spurling sign, and weakness of the
right biceps.  (Id.).  An MRI scan demonstrated a small disc protrusion at C5-6 on the
right, correlating with her symptoms, and she was offered an anterior cervical
decompression instrumentation and fusion.  (Id.).  An injection of Depo-Medrol was
made in the subacromial bursa.  (Id.).

21.  Plaintiff was seen at Millennium Pain Management on November 9, 2009.  (Tr. 259).
Plaintiff at that time was on Lorcet, Naprosyn, Neurontin, and Valium.  (Tr. 258).  The
assessment at that time was cervical herniated intervertebral disk, cervical radicular pain,
right shoulder pain, thoracic spine pain, myofacial pain and bilateral knee degenerative
joint disease.  (Tr. 259).

22.  Plaintiff was seen November 13, 2009 by Dr. Bryan Burns.  (Tr. 351).  Plaintiff was
diagnosed as having sinusitis.  (Id.).

23.  A myocardial perfusion study was done on November 20, 2009.  (Tr. 269).

24.  Plaintiff was seen at Des Peres Hospital on November 24, 2009 and had undergone an

anterior cervical decompression and fusion at C5-6 by Dr. Mirkin. (Tr. 320). The impression on this hospital visit was neck pain status post anterior cervical decompression and fusion, spinal osteoarthritis, hypertension, coronary artery disease with a history of stent, obstructive sleep apnea on CPAP, irritable bowel syndrome, fibromyalgia, hypercholesterolemia, and obesity. (Tr. 321). For pain control, plaintiff was placed on Lorcet, her blood pressure medications were resumed, and plaintiff was counseled about smoking cessation. (Id.). Plaintiff was seen by Dr. Mirkin on November 23, 2009 with the diagnoses of cervical spondylosis, and herniated disc at C5-6 with radiculopathy. (Tr. 323). Plaintiff was to proceed with anterior cervical decompression and fusion, and plaintiff had been cleared for surgery by Dr. Gibson relative to any heart disease. (Id.). On physical exam plaintiff walked with her head out forward and had limited range of motion of the cervical spine. (Id.).

25. Plaintiff underwent surgery on November 24, 2009 at Des Peres Hospital under the auspices of Rhoderic P. Mirkin, undergoing a microdissection, anterior cervical diskectomy, partial vertebrectomy at C5-C6 to decompress the spinal cord, anterior interbody fusion at C5-6, placement of interbody cage at C5-6, and placement of Pioneer locking plate at C5-6. (Tr. 324).

26. Plaintiff was seen December 11, 2009 by Dr. Burns in a follow-up for her fibromyalgia. (Tr. 353). Plaintiff complained of severe pain and depression, noting she hurt everywhere and felt worse after her neck surgery, and was following with Dr. Granburg for pain. (Id.). Plaintiff also noted she had seen a psychiatrist and went back on Cymbalta for the fibromyalgia. (Id.). The assessment from Dr. Burns was hyperlipidemia, pain in the

back, and fibromyalgia.  (Id.).

27.  Plaintiff was seen by Dr. R. Peter Mirkin on December 18, 2009, complaining of some
neck pain status post surgery.  (Tr. 360).  X-rays revealed a consolidating fusion.  (Id.).
 Plaintiff discussed disability with Dr. Mirkin and had no plans of returning to the work
force.  (Id.).

28.  The attending physician's statement for disability claim was completed by Dr. Granberg
on December 20, 2009.  (Tr. 498).  Dr. Granberg noted plaintiff had cervical herniated disc
and neck pain with cervical radicular pain and right shoulder pain.  (Id.).  Plaintiff's
medication included Lorcet and Naproxen.  (Id.).  Plaintiff had been referred for
physical therapy and biofeedback treatment.  (Id.).

29.  A medical source statement completed for the insurance company by Dr. Peter Mirkin
December 30, 2009, who noted plaintiff had the primary diagnosis of C5-6 herniated
nucleus pulposus 722.0.  (Tr. 502).  Plaintiff had undergone a cervical fusion at C5-6 and
had been referred for physical therapy.  (Id.).  Plaintiff was off work November 18,
2009 through January 3, 2010.  (Tr. 503).  Plaintiff made a full recovery and was to return
to work January 4, 2010.  (Id.).

30.  Plaintiff was seen in Millennium Pain Management on January 28, 2010.  (Tr. 410).  Since
the last time she had been seen, plaintiff had surgery.  (Id.).  Plaintiff's chief
complaint was pain in the neck and right shoulder.  (Id.).  The assessment was cervical
herniated intervertebral discs at C4-5 and C5-6 status post cervical spine surgery
performed November 24, 2009 by Dr. Mirkin, cervicalgia, cervical radicular pain,
improved, right shoulder pain, thoracic spine pain, fibromyalgia/myofascial pain, and

bilateral knee degenerative joint disease. (Tr. 411). Plaintiff was to continue on Lorcet for

pain management, as well as Naproxen. (Tr. 412). Plaintiff was given a prescription for

Percocet for severe pain. (Id.). Though the surgery had helped the numbness in her

hands, the pain in her neck continued. (Id.). Plaintiff indicated she was on Cymbalta

for fibromyalgia. (Id.).

31. Plaintiff was seen by Dr. Chilakamarri on February 3, 2010 for depression. (Tr. 399).

32. Plaintiff was seen at Hyland Behavioral Health Center on February 8, 2010 for outpatient

treatment. (Tr. 429). Plaintiff had multiple diagnoses, including fibromyalgia and

hypertension. (Id.). There were multiple family issues involving her children. (Id.). It was noted

plaintiff had grown up with a physically abusive father who would beat

her with ball bats and belts. (Id.). The patient presented with many symptoms of

depression, hopelessness, helplessness, crying, poor sleep and pain from fibromyalgia,

and felt overwhelmed, finding no relief from the treatments provided and had been out of

work since her surgery in November 2009. (Id.). The diagnosis offered by Dr.

Chilakamarri was major depression, dependent personality disorder, and an assessed axis

V GAF of 52. (Tr. 430). Treatment plan included group therapy, medications, family

therapy, and ongoing individual therapy. (Id.).

33. Dr. Chilakamarri saw plaintiff on March 1, 2010. (Tr. 441).

34. Dr. Bryan Burns completed a physician's statement for a disability insurance company

April 4, 2010, noting plaintiff had primary diagnoses of 729.1, 724.5, 414.9, 296.0, and

723.1, with chronic pain in the back and neck. (Tr. 500). Plaintiff s medications included

Cymbalta, Lisinopril, Norvasc, Naproxen, Lovastatin, Plavix, HCTZ, Lorcet, and Neurontin.

(Id.).  Dr. Burns assessed plaintiff as being able to occasionally bend at the waist and reach above the shoulder, and to continuously use foot controls and drive.  (Tr. 501).  Dr. Burns indicated in an 8-hour day plaintiff could lift and carry 20 pounds and frequently lift up to 10 pounds.  (Id.).  Over the course of an 8-hour day with 2 breaks and lunch, plaintiff could alternately stand 3-5 hours, sit 3-5 hours, walk 3-5 hours, and drive 3-5 hours.  (Id.).  Plaintiff was unable to return to work secondary to her pain.  (Id.).

35.  Podiatrist Seth Anderson saw plaintiff on April 7, 2010 and assessed plaintiff as having sinus tarsi syndrome, plantar fasciitis/bursitis bilateral left greater than right, and possible tarsal tunnel syndrome.  (Tr. 453).  Plaintiff was to get a nerve conduction study and EMG to rule out peripheral neuropathy versus tarsal tunnel syndrome, and those results were to be reviewed.  (Id.).  Plaintiff was to be set up for MRIs bilaterally.  (Id.).

36.  Plaintiff was seen by Dr. Bryan Burns on April 9, 2010 in a follow-up for fibromyalgia and a nerve conduction study.  (Tr. 467).  Plaintiff was assessed as having fibromyalgia and pain in the ankle and foot.  (Id.).

37.  Plaintiff was seen April 22, 2010 at Millennium Pain Management.  (Tr. 416).  At that time she was assessed as having cervical herniated intervertebral disc at C4-5 and C5-6 status post cervical spine surgery performed November 24, 2009, as well as cervicalgia, cervical radicular pain improved, right shoulder pain, thoracic spine pain, fibromyalgia/myofascial pain, and bilateral degenerative joint disease.  (Tr. 417).  Plaintiff was to continue Oxycodone for severe pain, as well as Lorcet and Naproxen.  (Tr. 417-418).  Plaintiff had an appointment with Dr. Anderson about possible nerve entrapment.  (Tr. 418).

38. A physical residual functional capacity questionnaire was completed by Dr. Bryan Burns on April 30, 2010. (Tr. 514-518). Dr. Burns indicated plaintiffs diagnoses were fibromyalgia, major depression, cervical spine disease, and chronic pain with pain noted in the back and neck with radiation down the arms, and fatigue. (Tr. 514). Plaintiff had limited range of motion of the upper extremities and paraspinal muscle tenderness to palpitation. (Id.). Plaintiff was noted to have depression. (Id.). Plaintiff would have her attention and concentration frequently interfered with secondary to the depression, and was incapable of even low stress jobs, and with constant pain, plaintiff could not focus. (Tr. 515). Dr. Burns estimated plaintiff would only be able to sit for no more than 2 hours, could only stand for 30 minutes at a time, and would need to sit after that. (Id.). Dr. Burns indicated plaintiff could stand or walk less than 2 hours, but sit at least 6 hours during an eight-hour workday. (Id.). Plaintiff would need to take unscheduled breaks averaging 8 times per day for 10 minutes at a time. (Tr. 516). Plaintiff could occasionally lift 10 pounds but never 20 pounds. (Id.). Plaintiff could only occasionally turn head to the right or left, look up, or look down. (Tr. 517). Plaintiff could rarely climb ladders or stairs and could only occasionally twist, stoop, bend, crouch, or squat. (Id.). The earliest date applied to those limitations was January 21, 2009. (Tr. 518).

39. An x-ray of the chest dated May 20, 2010 noted borderline cardiomegaly representing an increase in heart size since the January 30, 2008 x-ray, with cervical fusion hardware noted. (Tr. 495).

40. Plaintiff was seen by Dr. Chilakamarri on June 24, 2010 and it was noted the long-term

disability company was reevaluating her condition, as plaintiff had been diagnosed with fibromyalgia. (Tr. 442). Plaintiff had positive findings of depression. (Tr. 443). Plaintiff was on Xanax and Prozac, and Wellbutrin was added. (Id.).

41. Plaintiff was seen in Millennium Pain Management on July 9, 2010 in a follow-up. (Tr. 413). Plaintiff complained of pain everywhere and described it as aching, agonizing pain which was constant. (Id.). Plaintiff indicated Hydrocodone had provided more pain relief than the Oxycodone, and she was still having foot pains, with most problems in her left foot, but she did have continued swelling in the right foot she attributed to fibromyalgia. (Id.). The assessment was cervical herniated intervertebral disc at C4-5 and C5-6 with a history of cervical spine surgery from November 24, 2009 by Dr. Mirkin, cervicalgia, cervical radicular pain improved, right shoulder pain, thoracic spine pain, fibromyalgia/myofascial pain, bilateral knee degenerative joint disease, and left foot pain. (Tr. 414). Plaintiff wanted to increase the Lorcet but had her medication changed to Norco, was prescribed Roxicodone, was to have an MRI of the left foot July 22, 2010, and was scheduled to see Dr. Anderson to schedule a plantar fasciitis surgery and possibly an injection of the left foot cyst. (Tr. 415).

42. Plaintiff was seen by Dr. Seth Anderson, a podiatrist, on July 14, 2010, who reviewed her nerve conduction and EMG. (Tr. 454). Dr. Anderson noted plaintiff continued to have pain in her left heel, and also noting several fibromas to the plantar left arch, pain on the lateral right ankle, and significant pain in the right ankle joint. (Id.). The assessment was sinus tarsi syndrome, plantar fasciitis/bursitis left more than right with heel spur, and plantar fibromas on the left. (Tr. 454). Options were discussed with the patient. (Id.).

Those options included injections versus excision.  (Id.).  Ultimately, plaintiff elected to be scheduled for left plantar fascia release with heel spur resection and injection of fibromas left with sinus tarsi injection right foot at some point in the near future.  (Id.).

43.  Plaintiff was seen at St. Anthony's Medical Center on August 4,2010 with complaints of ankle pain.  (Tr. 433-434).

44.  Plaintiff was seen by Dr. Burns on September 28, 2010.  (Tr. 460).  The assessment of Dr. Burns was diabetes mellitus type II and pain in the ankle and foot.  (Tr. 461).

45.  Plaintiff was seen October 18, 2010 at Millennium Health Care complaining of neck and right shoulder pain.  (Tr. 422).  Plaintiff's assessment remained the same with the exception she now was diagnosed with left foot fibromas and plantar fasciitis and left foot pain and mild right foot pain.  (Tr. 423-424).

46.  Plaintiff underwent a removal of plantar fibromas times 4 on the left foot and tailor's bunionectomy left 5th metatarsal, and matricectomy bilateral borders, left hallux on November 8, 2010.  (Tr. 543).

47.  Plaintiff was seen on November 16, 2010 by Dr. Geistler status post one week from the surgical removal of plantar fibromas in the left foot.  (Tr. 542).

48.  Plaintiff was seen by Dr. Geistler November 29, 2010 with regard to suture removal for multiple plantar fibromas which were removed from her left foot.  (Tr. 539).  Plaintiff was to remain off her foot for a week.  (Id.).

49.  Plaintiff was seen throughout December 2010 for improving surgical incision.  (Tr. 536-538).

50.  Plaintiff was seen by Dr. Chilakamarri on December 2, 2010.  (Tr. 444).  Plaintiff was still depressed.  (Id.).

51.  Plaintiff was seen January 3, 2011 by Dr. Geistler.  (Tr. 532).  Plaintiff had a plantar

incision to remove multiple plantar fibromatoses from the left foot.  (Id.).  Initially, the

surgery went well, but plaintiff developed a sizable hematoma and had some wound

dehiscence postoperatively.  (Id.).

52.  A New York Heart Association's Classification Scale was completed by Dr. Paul Gibson

on January 4, 2011, indicating plaintiff had a Class II heart, which noted a slight

limitation of physical activity, being comfortable at rest, but ordinary physical activity

resulted in fatigue, palpitation, dyspnea, or angina pain.  (Tr. 519).  Dr. Gibson completed a

Cardiac Residual Functional Capacity questionnaire indicating plaintiff did have a Class

II heart with coronary artery disease and angina with chest pain and anginal equivalent

pain.  (Tr. 520).  Plaintiff was capable of low stress jobs and had cardiac symptoms which

would occasionally interfere with the attention and concentration needed to perform even

simple work tasks.  (Tr. 521).  Dr. Gibson indicated plaintiff would be able to walk 6

blocks and could stand, walk, or sit at least 6 hours.  (Tr. 522).  Plaintiff would miss about

one day of work per month secondary to her impairment or treatment.  (Tr. 524).

53.  Plaintiff was seen January 24, 2011 at Geistler Footcare and it was noted she had a

healing incision of the plantar site on the left.  (Tr. 528-529).  Dr. Geistler indicated

plaintiff's wound was closing down nicely on January 13, 2011, but she got a

postoperative infection of the plantar fascial area, was treated with Levaquin and

Clindamycin, and it was closing down nicely.  (Tr. 530).  Plaintiff had far less pain and far

less edema and arrhythmia.  (Id.).

54.  Plaintiff was seen at Geistler Footcare on February 9, 2011.  (Tr. 526).  It was noted

plaintiff had an infection at the incision site on the left ankle. (Tr. 527).

## The ALJ's Determination

The ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.  The claimant has not engaged in substantial gainful activity since November 15, 2009, the alleged disability onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: coronary artery disease; degenerative disc disease (status post fusion at C5-6); fibromyalgia; sleep apnea; planter's fasciitis; and residuals of surgery to the left foot (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work except for the following additional limitations: she must have a sit/stand option with the ability to change positions frequently; she can occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl; she can never climb ropes, ladders, or scaffolds; and she is limited to only frequent reaching in all directions.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was a younger individual on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national

economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from November 15, 2009 through the date of this decision (20 CFR 404.1520(g)).

(Tr. 13-23).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits protectively filed on November 12, 2009, the claimant is not disabled under sections        216(I) and 223(d) of the Social Security Act.

(Tr. 23).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."

Id.

**B.    The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in

Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758. Application of the special procedures required

is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a
(e), 416.920a (e).

## C.     Plaintiff's Claims

Plaintiff first argues that the ALJ erred in determining plaintiff's residual functional
capacity.  Plaintiff next argues that the hypothetical question the ALJ posed to the vocational
expert was erroneous.  The undersigned will address plaintiff's claims in turn.

Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a
"'claimant's residual functional capacity is a medical question.'"  Lauer v. Apfel, 245 F.3d 700,
704 (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)).  The Eighth Circuit clarified in
Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th
Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ
should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,'
Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)."  Thus, an ALJ is "required to consider at
least some supporting evidence from a professional." Id. See also Vossen v. Astrue, 612 F.3d
1011, 1016 (8th Cir. 2010) ("The ALJ bears the primary responsibility for determining a
claimant's RFC and because RFC is a medical question, some medical evidence must support the
determination of the claimant's RFC."); Eichelberger, 390 F.3d at 591.

The ALJ made the following determination regarding plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity to perform light work except for the
> following additional limitations: she must have a sit/stand option with the ability
> to change positions frequently; she can occasionally climb stairs and ramps, stoop,
> kneel, crouch, and crawl; she can never climb ropes, ladders, or scaffolds; and she  is
limited to only frequent reaching in all directions.

(Tr. 15).

Plaintiff contends that, in determining plaintiff's RFC, the ALJ erred in relying on the opinion of plaintiff's cardiologist, Dr. Gibson, regarding plaintiff's physical limitations, while not including mental limitations found by Dr. Gibson. Plaintiff further argues that the ALJ erred in assigning less weight to the opinion of plaintiff's treating primary care physician, Dr. Burns.

The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole. Id. Normally, the opinion of the treating physician is entitled to substantial weight. Casey v. Astrue, 503 F.3d 687, 691 (8th Cir. 2007). The opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight. Singh, 222 F.3d at 452. The opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician. 20 C.F.R. § 404.1527(d)(1).

Dr. Gibson, plaintiff's treating cardiologist, completed a New York Heart Association's Classification Scale on January 4, 2011, noting that plaintiff had a Class II heart, which indicates a slightlimitation of physical activity, being comfortable at rest, but ordinary physical activity results in fatigue, palpitation, dyspnea, or angina pain. (Tr. 519). Dr. Gibson also completed a Cardiac Residual Functional Capacity questionnaire in which he indicated that plaintiff had a Class II heart, with symptoms of chest pain and anginal equivalent pain. (Tr. 520). Dr. Gibson found that plaintiff was capable of low stress jobs, and that her cardiac symptoms would occasionally interfere with the attention and concentration needed to perform even simple work tasks. (Tr. 521). Dr. Gibson indicated that plaintiff would be able to walk six

blocks, and could stand, walk, or sit at least six hours. (Tr. 522). Dr. Gibson also found that plaintiff could frequently lift up to twenty pounds. (Tr. 523). Finally, Dr. Gibson noted that plaintiff would miss about one day of work per month secondary to her impairment or treatment. (Tr. 524).

The ALJ indicated that he was assigning some weight to the general conclusion set forth in the New York Heart Association Classification questionnaire, and greater weight to the functional capacity questionnaire, which provided very specific limitations. (Tr. 19). The ALJ stated that he was assigning "great weight" to Dr. Gibson's opinions, as they were generally well-supported and consistent with the evidence as a whole. (Tr. 20). The ALJ stated that Dr. Gibson's opinions were entitled to greater weight than the opinions of Dr. Burns. (Id.).

Plaintiff does not dispute that the ALJ was entitled to assign great weight to the opinion of Dr. Gibson regarding plaintiff's physical limitations resulting from her cardiac impairments. See Kelley, 133 F.3d at 589 ("The Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of speciality than the opinion of a source who is not a specialist."). Plaintiff argues that the ALJ erred in failing to incorporate the following limitations found by Dr. Gibson: a need for a low stress job, and a job that would tolerate an occasional interference with attention and concentration. (Tr. 521). Defendant contends that the ALJ was not required to discuss the mental limitations found by Dr. Gibson because he had already determined that plaintiff's mental impairments were non-severe. Defendant also notes that plaintiff does not dispute the ALJ's severity determination with regard to plaintiff's mental impairments.

The undersigned finds that the ALJ erred in failing to include all of the limitations found by Dr. Gibson. The ALJ indicated that he was assigning great weight to Dr. Gibson's opinions, yet omitted the mental limitations found by Dr. Gibson without providing any explanation. While it is true that the ALJ had already found that plaintiff's mental impairments were non-severe, the ALJ was required to determine the combined effects of plaintiff's severe and non-severe medically determinable impairments in assessing her RFC. See 20 C.F.R. § 404.1545(a)(2). Thus, the fact that the ALJ had found plaintiff's mental impairments were nonsevere did not relieve him of his duty to consider the effect of any such mental impairment on her ability to function in the work setting. Further, Dr. Gibson found that plaintiff's cardiac symptoms, rather than a mental impairment discussed by the ALJ, resulted in decreased attention and concentration and a need for a low stress job. (Tr. 521). There is no contrary evidence in the record. In fact, the only other physician to express an opinion regarding plaintiff's specific work-related limitations, Dr. Burns, included the same limitations in his RFC questionnaire. (Tr. 515).

Plaintiff also argues that the ALJ should have assigned greater weight to the opinion of Dr. Burns. Dr. Burns completed a physician's statement for a disability insurance company on April 4, 2010, in which he found that plaintiff was able to occasionally bend at the waist and reach above the shoulder, and to continuously use foot controls and drive. (Tr. 501). Dr. Burns indicated that plaintiff could lift and carry twenty pounds occasionally and frequently lift up to ten pounds. (Id.). In an eight-hour workday, plaintiff could alternately stand three to five hours, sit three to five hours, walk three to five hours, and drive three to five hours. (Id.). Plaintiff was unable to return to work secondary to her pain. (Id.).

Dr. Burns also completed a physical residual functional capacity questionnaire on April 30, 2010. (Tr. 514-518). Dr. Burns indicated that plaintiff's diagnoses were

fibromyalgia, major depression, cervical spine disease, and chronic pain. (Tr. 514). Dr. Burns listed clinical findings of limited range of motion of the upper extremities and paraspinal muscle tenderness to palpitation. (Id.). Dr. Burns found that plaintiff's symptoms frequently interfered with her attention and concentration needed to perform even simple tasks, and that plaintiff was incapable of even low stress jobs. (Tr. 515). Dr. Burns estimated Plaintiff would only be able to sit for no more than two hours, and could only stand for thirty minutes at a time. (Id.). Dr. Burns indicated that plaintiff could stand or walk less than two hours, but could sit at least six hours during an eight-hour workday. (Id.). Plaintiff would need to take unscheduled breaks averaging eight times per day for ten minutes at a time. (Tr. 516). Plaintiff could occasionally lift ten pounds but could never lift twenty pounds. (Id.). Plaintiff could only occasionally turn her head to the right or left, look up, or look down. (Tr. 517). Plaintiff could rarely climb ladders or stairs and could only occasionally twist, stoop, bend, crouch, or squat. (Id.).

The ALJ found that Dr. Burns' opinions were not consistent with the evidence as a whole and that they were, therefore, not entitled to substantial weight. (Tr. 19). The ALJ stated that Dr. Burns appeared to rely heavily on plaintiff's subjective report of symptoms and limitations. (Id.). The ALJ noted that Dr. Burns concluded his assessment by suggesting that plaintiff see another doctor to have her RFC assessed, which suggests that he did not have much confidence in his own assessment. (Id.). The ALJ stated that Dr. Burns' opinions are quite conclusory, with very little explanation of the evidence relied on in forming his opinions. (Id.). The ALJ pointed out that no other physician found that plaintiff was disabled or had limitations consistent with Dr. Burns' assessment. (Id.).

The undersigned finds that the ALJ provided sufficient reasons for discrediting the opinions of Dr. Burns. As the ALJ pointed out, Dr. Burns' opinion is rather conclusory, and his treatment notes do not contain objective findings that would support disabling impairments.

Although plaintiff objects to the ALJ's statement that Dr. Burns expressed uncertainty as to his findings, the record lends support to this statement. In his Physical Residual Functional Capacity Questionnaire, Dr. Burns noted next to his findings regarding plaintiff's limitations "unable to determine appropriately. Is an estimate." (Tr. 515-16). At the end of the questionnaire, Dr. Burns noted "It was recommend[ed] to patient to follow up with her surgeon to determine her functional limitations due to pain." (Tr. 518).

The undersigned also notes that Dr. Burns provided inconsistent opinions. On April 4, 2010, Dr. Burns found that plaintiff could lift and carry twenty pounds occasionally and frequently lift up to ten pounds, alternately stand three to five hours, sit three to five hours, walk three to five hours, and drive three to five hours. (Tr. 501). On April 30, 2010, Dr. Burns found much greater limitations. (Tr. 514-518). For example, Dr. Burns found that plaintiff could only occasionally lift ten pounds and could never lift twenty pounds, sit for no more than two hours, and could only stand for thirty minutes at a time. (Id.). The fact that Dr. Burns provided inconsistent opinions within one month of each other without explanation constitutes another reason for the ALJ to assign less weight to Dr. Burns' opinions.

While the ALJ provided sufficient reasons for discrediting the opinions of Dr. Burns, the RFC determined by the ALJ lacks the support of substantial evidence. As previously discussed, the ALJ indicated that he was assigning great weight to the opinion of Dr. Gibson, yet he did not incorporate all of the limitations found by Dr. Gibson. Significantly, Dr. Gibson was plaintiff's cardiologist and, as such, provided an opinion only with regard to plaintiff's cardiac impairment.

The ALJ found that plaintiff had severe impairments of coronary artery disease, degenerative disc disease (status post fusion at C5-6), fibromyalgia, sleep apnea, plantar's fasciitis, and residuals of surgery to the left foot. Plaintiff seeks regular treatment for these impairments, including treatment from a pain clinic, and takes narcotic pain medication. There is no indication, however, that the ALJ considered the effect of all of plaintiff's impairments on her ability to function in the workplace. The ALJ discredited the opinion of the only physician who provided an opinion based on plaintiff's combination of impairments.

Plaintiff also argues that the hypothetical question the ALJ posed to the vocational expert was deficient in that it did not include the mental limitations found by Dr. Gibson or all of the limitations found by Dr. Burns.

"Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision. Hypothetical questions should set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments." Jones v. Astrue, 619 F.3d 963, 972 (8th Cir. 2010). "The ALJ's hypothetical question to the vocational expert needs to include only those limitations that the ALJ finds are substantially supported by the record as a whole." Martise, 641 F.3d at 927.

As discussed above, the RFC determined by the ALJ is not supported by substantial evidence. The hypothetical question to the vocational expert was based on this erroneous RFC. Thus, the vocational expert's answer does not constitute substantial evidence supporting the Commissioner's denial of benefits.

## Conclusion

In sum, the ALJ erred in failing to incorporate all of the limitations found by plaintiff's treating cardiologist, Dr. Gibson. The ALJ also erred in failing to consider the effects of all of plaintiff's impairments in determining her RFC. For these reasons, this cause will be reversed and remanded to the ALJ in order for the ALJ to properly consider the mental limitations found by Dr. Gibson; consider the effects of all of plaintiff's impairments; and formulate a new residual functional capacity for plaintiff based on the medical evidence in the record and, if necessary, obtain additional evidence addressing plaintiff's ability to function in the workplace with her combination of impairments; and then to continue with the next steps of the sequential evaluation process. Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this 22nd day of February, 2013.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE